UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ZHUHAI SHENGCHANG ELECTRIC CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>ZHUHAI DEMI TECHNOLOGY CO. LTD., et al.,<br><br>Defendant. | No. 25 C 15117<br><br>Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Zhuhai ShengChang Electric Co., Ltd. ("SC Electric") alleges that Zhuhai DEMI Technology Co. Ltd. ("Demi") has infringed two of its patents for a dimming power supply for light-emitting diode ("LED") lights: U.S. Patent No. 9,942,959 ("'959 Patent") and U.S. Patent No. 10,039,167 ("'167 Patent"). The parties dispute the meaning of seven terms used in these two patents. *See* R. 49; R. 52; R. 53; R. 55. A neutral expert provided the Court with a tutorial on May 13, 2026. The Court held a claim construction hearing on June 2, 2026. The Court also received expert reports and depositions from both SC Electric and Demi. Additionally, the parties agreed on a neutral technical advisor (the same neutral expert who testified on May 13, 2026) who explained to the Court the "terminology and theory underlying the evidence offered by the parties." *See TechSearch L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1380 (Fed. Cir. 2002) ("[I]n those limited cases where the scientific complexity of the technology is such that the district court may require the assistance of a technical

advisor to aid in understanding the complex technology underlying the patent, it has the inherent authority to appoint such an advisor." *Id.* at 1378). The notes provided to the Court by the neutral expert were disclosed to the parties. The parties were given an opportunity to depose the neutral expert, and decided instead to file responsive supplemental briefings. *See* R. 67, 68. The following is the Court's resolution of the parties' disputes.

**Background**[1]

Both patents disclose three basic building blocks for a dimming power supply for LED lights: 1) a pre-existing (legacy) "phase-cut dimmer;" 2) a "phase-cut dimming circuit" (which is further specified as a "wide input voltage phase-cut dimming circuit"); and 3) an "LED lamp." *See generally* '959 Patent; '167 Patent.

LEDs are the present-day generation of light sources that have replaced conventional light sources (e.g. obsolete Edison incandescent and fluorescent light sources). LEDs save up to 85% electricity over conventional light sources. Unlike fluorescent lamps, LEDs do not contain toxic mercury.

The phase-cut dimmer is an existing dimming light switch that may be part of the legacy of a building. The dimmer is often kept when replacing an old non-LED light source with a new LED light source. This is problematic because the old phase-cut dimmer is incompatible with LED lighting. The phase-cut dimmer provides a 60 hertz alternating current ("AC") signal and a high voltage of 120, whereas LEDs

[1] Background information is from the in-court tutorial on May 13, 2026. *See generally* R. 57.

require a low direct current ("DC") voltage that is ON/OFF switched at a frequency greater than 200 hertz so as to avoid flickering.

The patented inventions solve this issue by creating a "dimming circuit" that is compatible with LED lights. The "dimming circuit" is a "wide input voltage phase-cut dimming control circuit" that can work with AC line voltages found around the world (ranging from 90 volts to 305 volts AC). It also provides a low-voltage DC signal that is compatible with LEDs. The patented "dimming circuit" performs the dimming by means of a pulse-width modulation ("PWM") signal (an ON/OFF signal in which the ON/OFF time ratio determines the dimming level).

**Legal Standard**

The claims of a patent define the patent's scope. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996). A plaintiff alleging infringement must show that a patent's claim "'covers the alleged infringer's product or process,' which in turn necessitates a determination of 'what the words in the claim mean.'" *Id.* at 374 (quoting H. Schwartz, Patent Law and Practice 1, 80 (2d ed. 1995)).

When the meaning of claim terms is disputed, the court resolves the dispute to "clarify and explain what the claims cover." *Baxter Int'l, Inc. v. CareFusion Corp.*, No. 15 C 99862019, WL 1897063, at *1 (N.D. Ill. Apr. 29, 2019) (citing *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005)); *see also Markman*, 517 U.S. at 373. "The plain claim language [is] the starting point for [the] analysis." *Sumitomo Dainippon Pharma Co. v. Emcure Pharms. Ltd.*, 887 F.3d 1153, 1157 (Fed. Cir. 2018). "There is a strong presumption that a claim term carries its ordinary and customary

meaning." *Seasonal Specialties, LLC v. Holiday Designs, LLC*, No. 23-CV-14008, 2025 WL 3702534, at *1 (N.D. Ill. Dec. 22, 2025) (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). That is, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . . ." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). This meaning is determined primarily from the intrinsic evidence—the claims themselves, the specification, and the prosecution history. *Id.* at 1314–17. Courts also may consider "extrinsic evidence," such as dictionary definitions, "to construe claims"—but "only if it is consistent with the intrinsic evidence." *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021). "If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence." *Id.*

35 U.S.C.S. § 112 establishes the requirements for patent specifications: "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention. The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." *Id.* at § 112(a)–(b). A patent claim is considered indefinite under 35 U.S.C. § 112(b) if it "fail[s] to inform, with reasonable certainty, those skilled in the

art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The definiteness inquiry is objective, focused on whether the claim language, read in light of the specification and prosecution history, provides sufficient clarity to a person of ordinary skill in the art ("POSITA").[2] *Id.* at 910.

Indefiniteness under §112(b) can arise from multiple sources, including when a specification invokes § 112(f) and fails to disclose adequate structure or when a term lacks an antecedent basis, meaning it is referenced without prior introduction. *See* R. 49 at 6–8. The defendant has the burden of showing indefiniteness by "clear and convincing evidence." *Maxell, Ltd. v. Amperex Tech, Ltd.*, 94 F.4th 1369, 1372 (Fed. Cir. 2024).

**Discussion**

Demi argues that each of the claims in dispute is indefinite on one of two bases. First, Demi argues that four disputed claim terms—"phase-cut dimming control circuit," "dimmer current maintaining circuit," "anti-interference circuit," and "PWM signal conversion circuit"—are indefinite because they invoke 35 U.S.C. § 112(f) and fail to disclose adequate structure. Second, Demi argues that three claim terms—"the phase-cut dimmer," "the LED light," and "the field effect transistor"—are indefinite because they lack an antecedent basis. The Court discusses each set of terms in turn.

[2] Here, a POSITA means someone with at least "(1) a bachelor's degree in electrical engineering, power electronics, or a closely related field (or the equivalent in education and experience); and (2) at least two years of experience designing or developing electronic circuits in general, including both digital and analogue electronic circuits. Additional education might substitute for some of the experience, and additional substantial experience might substitute for some of the educational background." R. 52 at pp. 9–10.

## I. 35 U.S.C. § 112(f)

The first four disputed terms are "phase-cut dimming control circuit," "dimmer current maintaining circuit," and "anti-interference circuit" in Claim 4 of the '959 Patent and "PWM signal conversion circuit" in Claim 4 of the '167 Patent.

The three disputed terms in Claim 4 of Patent '959 are used in the following context:

> A dimming power supply, compris[ing]:
>
> an **anti-interference circuit**, an active power factor correction circuit, a power conversion circuit, a **dimmer current maintaining circuit**, a **phase-cut dimming control circuit**, and a fi[eld] effect transistor; wherein an input terminal of the anti-interference circuit is connected to an output terminal of the phase-cut dimmer, an output terminal of the anti-interference circuit is connected to input terminals of the active power factor correction circuit, the **dimmer current maintaining circuit**, and the **phase-cut dimming control circuit**, respectively; an output terminal of the active power factor correction circuit is connected to an input terminal of the power conversion circuit; an output terminal of the power conversion circuit supplies a[] working power to the LED light via the fi[eld] effect transistor; a control terminal of the fi[eld] effect transistor is connected to an output terminal of the **phase-cut dimming control circuit**.

'959 Patent, Col. 2:5–22 (emphasis added).

"PWM signal conversion circuit" is used in Claim 4 of the '167 Patent in the following context:

> [A] phase-cut dimming circuit includes:
>
> a first diode, a second diode, a first resistor, a second resistor, a third resistor, a fourth resistor, a transistor, a photoelectric coupler, and a **PWM signal conversion circuit**;
>
> wherein a positive terminal of the first diode, and a

> positive terminal of the second diode are respectively connected to a phase line L and a zero line N of a power supply; a negative terminal of the first diode, and a negative terminal of the second diode are connected to one end of the first resistor; an other end of the first resistor is connected to one end of the second resistor, and a base of the transistor;
>
> wherein an other end of the second resistor is connected to an emitter of the transistor and shares a common ground with the phase-cut dimming circuit; a collector of the transistor is connected to one end of the third resistor, and a negative terminal of a light emitting tube of the photoelectric coupler;
>
> wherein an other end of the third resistor is connected to a positive terminal of the light emitting tube of the photoelectric coupler, and one end of the fourth resistor; an other end of the fourth resistor is connected to a power supply VCC; an output of the photoelectric coupler is connected to an input of the **PWM signal conversion circuit**; and an output of the **PWM signal conversion circuit** is connected to a gate of the field effect transistor.

‘167 Patent, Col. 2:5–28 (emphasis added).

Demi argues that each of these terms is indefinite because it invokes 35 U.S.C. § 112(f) and fails to disclose adequate structure. SC Electric responds that each of the claim terms is not indefinite and should be given its plain and ordinary meaning.

Section 112(f) states, “[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.” 35 U.S.C. § 112(f). Pursuant to § 112(f), a claim is indefinite if it fails to disclose the adequate corresponding structure to perform the claimed functions. *Fintiv, Inc. v. PayPal Holdings, Inc.*, No. 6:23-CV-490-ADA, 2023 WL

5423082, at *4 (W.D. Tex. July 21, 2023), *aff'd*, 134 F.4th 1377 (Fed. Cir. 2025).

To avoid indefiniteness under § 112(f), "[c]laim terms need not connote a single, specific structure, and may instead describe a class of structures and still recite sufficiently definite structure." *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1366 (Fed. Cir. 2022) (internal quotation omitted). And "structure can be recited," at least in part, through a functional "description of the claim limitation's operation and how the function is achieved in the context of the invention." *Id.* (internal quotation omitted).

The first step of a § 112(f) analysis is to determine whether the claim term at issue is in a means-plus-function format. *Fintiv, Inc. v. PayPal Holdings, Inc.*, 134 F.4th 1377, 1381 (Fed. Cir. 2025) (citing *Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1372–73 (Fed. Cir. 2020)). That is to say, the claim term uses the word "means." *Id.* Where, as here, the claim term does not contain the word "means," there is a rebuttable presumption that § 112(f) does not apply. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015). That presumption "can be overcome . . . if the challenger demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Id.* at 1349 (quoting *Watts v. XL Systems*, 232 F.3d 877, 880 (Fed. Cir. 2000)).

The second step is to identify the corresponding structure described in the specification. *Fintiv*, 134 F.4th at 1384. "[T]he claims are indefinite if the specification fails to disclose adequate corresponding structure to perform the

claimed function." *Id.*

Demi argues that each of these disputed claim terms—consisting of the word "circuit" modified by an adjectival phrase—is governed by § 112(f) because the specifications do not disclose sufficiently definite structure. According to Demi, "phase-cut dimming control," "dimmer current maintaining," "anti-interference," and "PWM signal conversion" are not recognized structural designations modifying "circuit," and therefore they are functional designations.

SC Electric responds that the United States Patent and Trademark Office ("USPTO") allowed the patents without raising indefiniteness concerns or applying § 112(f), which means a POSITA already reviewed the claims without flagging any indefiniteness issues. R. 52 at p. 20; *see Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1380 (Fed. Cir. 2017) (noting the fact that "the USPTO did not express any uncertainty as to the scope of [the term] or encounter any apparent difficulty in applying the term to the references" is intrinsic evidence in support of definiteness).

Additionally, SC Electric argues that § 112(f) does not apply because the claims do not use the term "means" and that a "circuit" term connotes sufficient structure so long as the circuit's input, output, and objective are identified. According to SC Electric, § 112(f) is avoided where "circuit" is modified by "additional adjectival qualifications further identifying sufficient structure." *Apex Inc. v. Raritan Comput., Inc.*, 325 F.3d 1364, 1373–74 (Fed. Cir. 2003). The focus is on whether the "operation of the circuit" is "describ[ed]": that is, the extent to which the circuit's "input,"

"objective," and "output" are identified. *Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1356 (Fed. Cir. 2006).

**a. "phase-cut dimming control circuit" Patent '959 (Claim 4)**

Demi has not overcome the presumption that § 112(f) does not apply to the term "phase-cut dimming control circuit." *See Apex.*, 325 F.3d at 1372 (explaining that the party seeking to overcome the presumption against the application of § 112(f) must do so by a preponderance of the evidence). In the '959 patent, a POSITA would find that the term "phase-cut dimming control" interpreted in light of the specification reasonably describes the circuit and its input, output, and objective: a circuit that accepts a wide input voltage range from a phase-cut dimmer, converts the phase-cut dimmer AC signal into a PWM DC signal, and increases the PWM frequency to values equal or greater than 200 hertz (so as to avoid flickering). The input of the circuit comes from a pre-existing phase-cut dimmer. The output of the circuit is connected to the gate electrode of a field-effect transistor that switches the current on and off for an LED lamp. The "phase-cut dimming control circuit" is illustrated as element 35 in Figure 2 (Embodiment 1) and Figure 3 (Embodiment 2) of the '959 Patent and associated narrative description, and identified in the figures below by means of a red box.



Figure 2



Figure 3

'959 Patent, Figures 2 & 3

The left-hand side of the red box converts the chopped AC signal to a PWM signal. The right-hand side of the red box converts the low-frequency PWM signal to a high-frequency PWM signal (> 200 hertz). Thus, the structure and function of the "phase-cut dimming control circuit" is reasonably clear. The term is not indefinite, and § 112(f) does not apply.

### b. "dimmer current maintaining circuit" Patent '959 (Claim 4)

Demi argues that the modifier "dimmer current maintaining" describes what the "circuit" does—supplies a maintaining current to a dimmer—but not what it is structurally. Demi also argues that the specification contains a "generic block" that discloses "no structure whatsoever." R. 49 at p. 16.

SC Electric responds that the word "circuit" connotes structure. *See Abacus*, 462 F.3d at 1355. And that the term includes an "adjectival qualification[]"—dimmer current maintaining—that modifies the word "circuit," and thus necessarily narrows the class of structures covered by that word. *See Apex*, 325 F.3d at 1374.

"Dimmer current maintaining circuit" is identified in the below image as element "34."




'959 Patent, Figure 1

According to the specification, "[d]immer current maintaining circuit 34 supplies a maintaining current to phase-cut dimmer 2 connected to wide input voltage phase-cut dimming power supply 3, so that a stable work of phase-cut dimmer 2 is ensured. Further, dimmer current maintaining circuit 34 can enhance the compatibility between wide input voltage phase-cut dimming power supply 3 and a leading-edge dimmer or a trailing-edge dimmer." '959 Patent, Col. 5:44–51. A core function of the "dimmer current maintaining circuit" is that it "supplies a maintaining current to phase-cut dimmer 2."

The neutral expert did not agree with Demi's characterization that no structure was disclosed; he raised concern that the figurative disclosure of the '959 Patent appears inconsistent with the narrative disclosure. The figures contained in the '959 Patent show a unidirectional arrow indicating that the "dimmer current maintaining circuit" 34 receives a signal, without showing an arrow in the opposite

direction for "suppl[ying] a maintaining current to phase-cut dimmer 2." The unidirectional arrow is shown between boxes 31 and 34 in the figure above. Additionally, the figure shows no connection going from the "dimmer current maintaining circuit 34" to the "phase-cut dimmer 2." However, the narrative disclosure of the '959 Patent states that the "dimmer current maintaining circuit 34 supplies a maintaining current to phase-cut dimmer 2." '959 Patent, at Col. 5:44–46. According to the expert, while the "phase-cut dimmer 2" is a very common device that a POSITA would be familiar with, a POSITA would also be aware that typical "phase-cut dimmer[s]" lack an input from a "dimmer current maintaining circuit." However, SC Electric explains that the expert's confusion results from him thinking the dimmer current maintaining circuit provides a maintaining current *directly* to the phase-cut dimmer. R. 67 at p. 2. Instead, SC Electric explains that the dimmer current maintaining circuit and the phase-cut dimmer are part of the same loop—because all circuits are loops—whereby the dimmer current maintaining circuit *indirectly* supplies a holding current to the phase-cut dimmer. *Id.* at p. 6.

According to SC Electric, phase-cut dimmers require a minimum current to function. *Id.* p. 7. If the amount of current moving through the system dips, it may cause the dimmer to shut off temporarily. *Id.* So, if the LED light is the only component drawing current, the amount of current pulled by the system may dip below the minimum current requirement of the phase-cut dimmer, causing flickering. *Id.* The dimmer current maintaining current solves this problem by drawing additional current, "tricking" the phase-cut dimmer into drawing more current. *Id.*

By drawing power, the dimmer current maintaining circuit ensures that a stable amount of current is always traveling though the loop. *Id.*; *see also* Claim Construction Hearing Transcript ("CC Hearing Tr.") at p. 68:7–17 ("With an LED, there is not much current on there. And so, the TRIAC[3] dimmer might say, oh, I'm not needed; I'm shutting off. And this is something that a person of ordinary skill in the art would know . . . [T]hey would know that they need to keep, with an LED, they need to keep the TRIAC awake. And this is a maintaining current that tells the TRIAC, hey, you're still needed to maintain the level of chopping that you're doing. So that's the objective behind it and . . . a person of ordinary skill in the art would know that."). Notably, this current is not supplied by a wired connection but by drawing additional current downstream from the phase-cut dimmer. R. 67 at p. 7. Therefore, the narrative and figurative disclosures are congruous.

Further, SC Electric argues that Demi did not raise this issue, but rather the neutral expert raised it, and therefore it was not briefed and should not be considered by the Court. Indeed, Demi recognized that a POSITA would understand that the dimmer current maintaining circuit "maintain[s] a holding current for a TRIAC dimmer." R. 49 at p. 15. Demi did not argue that uncertainty resulted because the dimmer current maintaining circuit does not directly supply a current to the phase-cut dimmer. Demi instead argued a POSITA would understand that maintaining a holding current "could conceivably be accomplished by many different circuit topologies." *Id.* And, because "[i]t is for the *parties*—not the court—to chart the course

[3] Triode for alternating current ("TRIAC").

of the litigation," the Court will not invalidate based on an argument raised by neither party. *Astellas Pharma, Inc. v. Sandoz, Inc.*, 117 F.4th 1371, 1378 (Fed. Cir. 2024). "[T]here are circumstances in which it may be appropriate for a court to take a 'modest initiating role' in the shape of the litigation. But rendering a patent invalid on a basis not advanced by any party is not such a circumstance." *Id.* (*quoting United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)).

Ultimately, the defendant has the burden of showing indefiniteness by "clear and convincing evidence." *Maxell*, 94 F.4th at 1372. Demi has not done so here.

**c. "anti-interference circuit"**
**Patent '959 (Claim 4)**

Demi argues that the term "anti-interference circuit" is subject to § 112(f) because there is no specification as to what kind of interference, what level of reduction, or what elements accomplish the "anti-interference." R. 49 at p. 17. However, an "anti-interference circuit" is a well-known circuit that a POSITA would reasonably understand. The "anti-interference circuit" has the purpose of avoiding electro-magnetic interference ("EMI") that would negatively affect unrelated devices such as WiFi, radio, television, and TV remote control devices. *See* Tutorial Presentation at p. 16.

Power supplies, in particular dimming power supplies and switching-mode power supplies, internally use high-frequency PWM and chopped signals that are known to cause EMI. That is, the power supply can interfere with other devices that use electromagnetic radiation. In particular, the power supply may interfere with WiFi, radio, television, and TV remote control devices. Such electromagnetic

interference must be avoided as a matter of national electrical regulations. *See Standards & Engagement*, Underwriters Lab'ys, https://underwriterslaboratories.org (regulating electrical device interference in the United States). In order to comply with regulations, an "anti-interference circuit" is commonly employed. Thus, a POSITA would be well aware of "anti-interference circuit[s]."

"[T]here is very clear input, output, and structural objective of what an anti-interference circuit is, and any electrical engineer worth their weight in salt would know how to do this in terms of designing an anti-interference circuit." R. 53 Ex. G (Lebby Dep.) at p. 91:17–23. Such circuits frequently use low-frequency pass filters that include capacitors that block the unwanted radio-frequency components that cause electromagnetic interference. The '959 Patent states: "Anti-interference circuit 31 plays a role in anti-surge and electromagnetic interference reduction. If a bleeder circuit composed of a capacitor and a resistor connected in series is added into anti-interference circuit 31, the compatibility between wide input voltage phase-cut dimming power supply 3 and phase-cut dimmer 2 can be enhanced." '959 Patent, Col. 5:15–21. That is, the '959 Patent teaches that a "bleeder circuit composed of a capacitor and a resistor" is an example of an "anti-interference circuit." *Id.* The '959 Patent is therefore sufficiently definite as to the "anti-interference circuit."

**d. "PWM signal conversion circuit"**
**Patent '167 (Claim 4)**

Demi argues that "PWM signal conversion" is purely functional and that Claims 5 and 6 of the '167 Patent confirm this by using "fundamentally different implementations—one analog, one digital—described by dependent claims as

alternative sub-structures for the same 'PWM signal conversion circuit' in the independent claim." R. 49 at pp. 21–22. Therefore, according to Demi, PWM signal conversion circuit cannot be sufficiently definite. SC Electric maintains that "circuit" connotes structure and that the specification further identifies the input, objective, and output of this circuit. *See Abacus*, 462 F.3d at 1355–56.

A PWM signal and its duty cycle are well-known concepts in the art. R. 52 Ex. 1 ¶ 50. A pulse width modulation ("PWM") is an ON/OFF signal that causes the LED light to rapidly switch between the ON (light emitted) and OFF state (no light emitted). If the LED light is mostly OFF, the light is strongly dimmed (low light intensity). If the LED light is mostly ON, the light is weakly dimmed (high light intensity). If the frequency of the PWM signal is low, such as 60 hertz, the human eye follows the ON/OFF switching cycle and the LED light flickers. However, if the frequency of the PWM signal is high, such as 200 hertz, the human eye cannot follow the ON/OFF switching cycle and the LED light appears to be smooth and continuous. Therefore, the low-frequency PWM signal needs to be converted to a high-frequency PWM signal. The "PWM signal conversion circuit" converts a low-frequency PWM signal into a high-frequency PWM signal.

The '167 Patent teaches: "Since the frequency of the PWM signal is low, if it is directly used to control dimming, the naked eyes of human[s] will feel obvious flickers, and a dimming range of 0-100% cannot be covered." '167 Patent, Col. 2:66–3:2. The '167 Patent further states: "Hence, the PWM signal is converted into a PWM signal having a frequency more than 200 [hertz] by the PWM signal conversion circuit and

the dimming range of 0-100% is covered." *Id.* at Col. 3:2–3:5. Figure 2 of the '167 Patent, below, shows that the input of the "PWM signal conversion circuit" is a low frequency PWM signal, and the output of the "PWM signal conversion circuit" is a high frequency PWM signal.




'167 Patent, Figure 2

In the images below, the '167 Patent shows a low frequency PWM signal (sub-figure "B") and a high frequency PWM signal (sub-figure "E").




'167 Patent, Figure 5

The ’167 Patent states that the output of the “PWM signal conversion circuit” is a high frequency (e.g. 200 hertz) PWM signal: “The PWM signal having a frequency more than or equal to 200 [hertz] is converted and output[ted] by PWM signal conversion circuit 201.” It also states that the “PWM signal conversion circuit” can be implemented by using a micro-controller unit (“MCU”): “The difference between the embodiment 2 and the embodiment 1 is that PWM signal conversion circuit 201 includes MCU signal conversion circuit 213 instead. MCU signal conversion circuit 213 is composed of a microcontroller and some peripheral devices.” ‘167 Patent, Col 6:14–18. An MCU can be programmed to fulfill a specified function. Therefore, a POSITA would understand the workings of a “PWM signal conversion circuit” and have no issue implementing a “PWM signal conversion circuit.”

Because a POSITA would reasonably understand its input, objective, and output, the “PWM signal conversion circuit” is sufficiently definite as described in the ’167 Patent.

## II. Antecedent Basis

The next three disputed terms are “the phase-cut dimmer” and “the LED light” in Claim 4 of the ‘959 Patent and “the field effect transistor” in Claim 4 of the ‘167 Patent. Demi claims the word “the” requires an antecedent basis, which it contends is lacking.

“The phase-cut dimmer” and “the LED light” are used in the fourth claim of Patent ‘959 in the following context:

> A dimming power supply, compris[ing]:
> an anti-interference circuit, an active power factor

> correction circuit, a power conversion circuit, a dimmer current maintaining circuit, a phase-cut dimming control circuit, and a fi[eld] effect transistor; wherein an input terminal of the anti-interference circuit is connected to an output terminal of **the phase-cut dimmer**, an output terminal of the anti-interference circuit is connected to input terminals of the active power factor correction circuit, the dimmer current maintaining circuit, and the phase-cut dimming control circuit, respectively; an output terminal of the active power factor correction circuit is connected to an input terminal of the power conversion circuit; an output terminal of the power conversion circuit supplies a[] working power to **the LED light** via the fi[eld] effect transistor; a control terminal of the fi[eld] effect transistor is connected to an output terminal of the phase-cut dimming control circuit.

‘959 Patent, Col. 2:5–22 (emphasis added).

“The field effect transistor” is used in the fourth claim of Patent ‘167 in the following context:

> [A] phase-cut dimming circuit includes:
>
> a first diode, a second diode, a first resistor, a second resistor, a third resistor, a fourth resistor, a transistor, a photoelectric coupler, and a PWM signal conversion circuit;
>
> . . .
>
> wherein an other end of the third resistor is connected to a positive terminal of the light emitting tube of the photoelectric coupler, and one end of the fourth resistor; an other end of the fourth resistor is connected to a power supply VCC; an output of the photoelectric coupler is connected to an input of the PWM signal conversion circuit; and an output of the PWM signal conversion circuit is connected to a gate of **the field effect transistor**.

‘167 Patent, Col. 2:5–8, 21–28 (emphasis added).

Demi argues that each of these terms is indefinite because it lacks an antecedent basis. SC Electric responds that each of the claim terms is unambiguous and should be given its plain and ordinary meaning in light of the specification and the claims as a whole.

"[T]he failure to provide explicit antecedent basis for terms does not always render a claim indefinite." *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006) (quoting MPEP § 2173.05(e) (8th ed. Rev. 2, May, 2004)). Rather, "despite the absence of explicit antecedent basis, '[i]f the scope of a claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite.'" *Id.* at 370–71 (quoting *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1359 (Fed. Cir. 2001)). This means that an "antecedent basis can be present by implication." *Pinpoint Inc. v. Hotwire, Inc.*, No. 11 C 5597, 2013 WL 1174688, at *6 (N.D. Ill. Mar. 20, 2013) (quoting *Energizer,* 435 F.3d at 1371). And when "the meaning of the claim would reasonably be understood by persons of ordinary skill when read in light of the specification, the claim is not subject to invalidity upon departure from the protocol of 'antecedent basis.'" *Energizer*, 435 F.3d at 1370.

**a. "the phase-cut dimmer" / "the LED light"
Patent '959 (Claim 4)**

Demi argues the '959 Patent recites the only six elements that make up the "dimming power supply" (an anti-interference circuit, an active power factor correction circuit, a power conversion circuit, a dimmer current maintaining circuit, a phase-cut dimming control circuit, and a filed effect transistor") but the following "wherein" clause references "the phase-cut dimmer" and "the LED light," which were not previously

introduced. *See* '959 Patent, Col. 2:16–28. According to Demi, the use of the definite article "the" presupposes prior introduction of the limitations noted. R. 49 at p. 19 (citing MPEP § 2173.05(e) ("[i]f a claim refers to 'the thing' but the thing has not been previously introduced, the claim is indefinite")). As a result, there is "outcome-determinative ambiguity" about the scope of the terms. *Id.*

Here, the terms at issue are common and well-known within the industry. Given the priority date of the patents (March 29, 2017), the "phase cut dimmer" is a well-known legacy device that has been available to consumers for more than 50 years, and the "LED light" is a well-known lighting device that has been available to consumers for more than 20 years. *See* R. 57 at p. 18:6–7.



SC Electric CC Presentation, Slide 13

The image above shows a phase-cut dimmer. A POSITA would understand what a "phase cut dimmer" is: it suppresses (cuts out) parts of the AC signal (as shown in the image below) thereby causing a dimming of the light.




SC Electric CC Presentation, Slide 11

Similarly, a POSITA would be familiar with "LED light[s]" and would find the disclosure of "LED light[s]" in the '959 Patent adequate.

SC Electric further points out that the "phase-cut dimmer" and "LED light" are part of the environment in which the invention covered by Claim 4 of the '959 Patent operates, but are not the invention itself. R. 52 at p. 22–23. The referent of a claim term may merely be "part of 'the environment' in which the [infringing] device must function," without being an element that must be included for the device to infringe. *INVT SPE LLC v. Int'l Trade Comm'n*, 46 F.4th 1361, 1375 (Fed. Cir. 2022) (quoting *Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368, 1374 (Fed. Cir. 2011)). The specification supports this by using "dimming power supply" in contradistinction to the phrases "phase-cut dimmer" and "LED light." Notably, claim 1 of the '959 Patent covers a "dimming circuit system," which comprises "an electric network power supply, a phase-cut dimmer, a dimming power supply, and an LED

light." '959 Patent, Col. 6:58–60. The fact that the patent refers to "a dimming power supply" *separately* from "a phase-cut dimmer" and "an LED light" implies the latter are not necessary elements of a dimming power supply. The specification further clarifies that the dimming power supply is distinct from the phase-cut dimmer and LED light: the "dimming power supply" receives a "current" from the "phase-cut dimmer" and then "supplies a working power to [the] LED light." *Id.* at Col. 3:18–21. While the "phase-cut dimmer" and "LED light" are not elements of the claim, recitation of those terms in "wherein" clauses is sensible because the things to which those terms refer are necessary for the inventions to operate. Without receiving a chopped alternating current signal from a phase-cut dimmer, and without a connection to an LED light, a dimming power supply covered by Claim 4 of the '959 Patent would not be able to perform its function of controlling the brightness of an LED light. R. 52 Ex. 1 ¶ 71. According to SC Electric, "an infringer [does] not need to, for instance, use, make, or sell" a phase-cut dimmer or LED light in conjunction with an infringing dimmable LED driver. *See INVT*, 46 F.4th at 1375. The claims and specifications here thus support a construction that infringement requires a device to include the elements recited in the "comprising" clauses, in addition to being *capable* of connecting to a phase-cut dimmer or of supplying power to an LED light.

Because the meaning of the claim would reasonably be understood by a POSITA when read in light of the specification, the terms are not indefinite.

**b. "the field effect transistor"**
**Patent '167 (Claim 4)**

Demi makes the same arguments for the term "field effect transistor" from

Patent ‘167. Claim 4 of the ‘167 Patent recites, “A phase-cut dimming circuit, comprising: a first diode, a second diode, a first resistor, a second resistor, a third resistor, a fourth resistor, a transistor, a photoelectric coupler, a PWM signal conversion circuit.” ‘167 Patent, Col. 2:5–8. The final clause states: “an output of the PWM signal conversion circuit is connected to a gate of the field effect transistor.” *Id.* at Col. 2:27–28. According to Demi, the use of the definite article “the” presupposes prior introduction of “a field effect transistor.” And Demi argues that this presents the same ambiguity as the preceding terms. R. 49 at p. 25.

SC Electric also relies upon the same arguments in response. R. 52 at p. 24 (“The same analysis applies to the ‘phase-cut dimming circuit’ covered by claim 4 of the ’167 Patent”). SC Electric claims that the “field effect transistor” is part of the environment rather than an element of the claim. Claim 1 of that patent confirms a clear distinction between a “phase-cut dimming circuit” and a “field effect transistor”: “an output terminal of the phase cut dimming circuit is connected to a gate of the field effect transistor.” ‘167 Patent, Col. 7:64–65. And the specification provides additional confirmation of this distinction. *See id.* at Col. 1:54–56 (referring, in the invention summary, to the “phase-cut dimming circuit” separately from “a field effect transistor”); *id.* at Col. 3:48–50 (clarifying that “[t]he output terminal of . . . phase cut dimming circuit . . . is connected to a gate terminal of field effect transistor”). The claims and specifications here thus support a construction that infringement requires a device to include the elements recited in the “comprising” clauses, in addition to being *capable* of connecting to a field effect transistor.

Further, according to the neutral expert, a POSITA would be familiar with a "field effect transistor" as it is the most common electrical circuit element in electrical engineering and would find the disclosure of "field effect transistor" in the '167 Patent adequate. The circuit diagrams of the 1st and 2nd embodiment of the '167 Patent show two transistors: A bipolar junction transistor, Q1, and a field-effect transistor, Q2. The two transistors Q1 and Q2 are shown in the image below. A POSITA would understand that the circuit symbol of Q1 represents a bipolar junction transistor and the circuit symbol of Q2 represents a field-effect transistor. The figure below is Figure 3 of the '167 Patent and shows the 1st embodiment.




'167 Patent, Figure 3

The '167 Patent gives reasonable information relating to the "field effect transistor." Therefore, because a POSITA would reasonably understand the claim when read in light of the specification, the term is not indefinite due to the lack of antecedent basis.

ENTERED:

Thomas M Durkin

Honorable Thomas M. Durkin
United States District Judge

Dated: November 16, 2026